[No. F064265. Fifth Dist. Oct. 31, 2013.]

In re the Marriage of BECKY J. and GARY J. BURWELL.
BECKY J. BURWELL, Movant and Appellant, v.
CYNTHIA BURWELL, Objector and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. through IX. of the Discussion.

6

## Counsel

Bowman and Associates, Stacy H. Bowman; Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett and Thomas V. DeNatale, Jr., for Objector and Appellant.

Stephen Temko for Movant and Appellant.

## Opinion

## POOCHIGIAN, Acting P. J.—

### INTRODUCTION

Are the proceeds of a term life policy community property or separate property of the spouse who pays the final premium? Our answer is an all too familiar one: it depends. We hold that the characterization "will depend on the . . . premium for the final term of the policy." (*Minnesota Mutual Life Ins. Co. v. Ensley* (9th Cir. 1999) 174 F.3d 977, 983 (*Minnesota Mutual Life Ins. Co.*).) The effect of the rules governing characterization of term life insurance proceeds depends on multiple factors, including whether the policy contains certain contractual provisions, and the insurability of the insured spouse. The result is an unfortunately intricate methodology for allocating proceeds of term life insurance policies. Were we free to abandon community property jurisprudence and craft a simpler holding we might do so. We are not.

Here, the trial court failed to make findings sufficient to determine proper characterization of the proceeds. Therefore, we vacate the court's order, and remand for further factual findings and application of the rules we set forth herein.[1]

### FACTS

In 1996, during the marriage of Becky J. Burwell[2] and Gary J. Burwell, a term life insurance policy was purchased (hereafter the "term life policy" or "the policy"). Gary was the insured and Becky was the named beneficiary until October 7, 2008.

In September 2004, Becky petitioned for dissolution of her marriage with Gary.

---

[1] The parties' remaining contentions do not alter this disposition. We discuss those contentions in the unpublished portion of our Discussion in parts III. through IX.

[2] Because Becky, Gary and Cynthia Burwell are referenced in the record at one point or another by the same last name, we use their first names for clarity.

*Automatic Temporary Restraining Orders*

Gary was served with a summons along with Becky's petition. The summons contained a number of automatic temporary restraining orders (ATROs). (See Fam. Code, § 2040; Cal. Rules of Court, rule 5.50(b).) The ATROs included the following text:

"Starting immediately, you and your spouse are restrained from: [¶] . . . [¶]

"2. cashing, borrowing against, cancelling, transferring, disposing of, or changing the beneficiaries of any insurance or other coverage including life, health, automobile, and disability held for the benefit of the parties and their minor child or children;

"3. transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life; and

"4. creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the transfer, without the written consent of the other party or order of the court. Before revocation of a nonprobate transfer can take effect, or a right of survivorship to property can be eliminated, notice of the change must be filed and served on the other party."

*Gary Remarries*

A status-only judgment of dissolution was entered in August 2005, and the court retained jurisdiction over all other issues. In November 2006,[3] Gary married Cynthia.

*August 2008 Stipulated Judgment*

In August 2008, Gary and Becky stipulated to a "further" judgment resolving some property issues. Though the stipulated judgment indicates that "the parties have reached an agreement with regard to the division of their marital property," five issues were explicitly reserved for a trial. One of the issues reserved for trial was "claims for breach of spousal fiduciary duty."

The stipulated judgment, signed by both parties, also states:

"16. <u>Full Disclosure of Assets and Gifts</u>. Each party has warranted to the other that he or she has no ownership interest in or claim to any property of any kind, other than the property described in this Further Judgment, and that he or she has not made, without the knowledge of the other, any gift or transfer of community property within the past five years for less than full and adequate consideration.

---

[3] Both parties agree in their briefs that Gary married Cynthia in November 2006.

"17. <u>After-Discovered And Concealed Assets</u>. If additional assets of a community property nature are subsequently discovered, the existence of which were in good faith unknown or forgotten by both parties, such assets shall be divided equally between the parties. All other after-discovered assets shall be divided as determined by a court of competent jurisdiction. This court specifically retains jurisdiction over all concealed or after-discovered assets."

The judgment also fixed the separation date at September 21, 2004.

### Change of Beneficiary

On October 7, 2008, Gary changed the beneficiary on the term life policy from Becky to Cynthia. Gary had not listed the policy in his preliminary or final disclosure declarations in the dissolution action. (See Fam. Code, §§ 2104, 2105.)

### Trial on Reserved Issues

The trial on reserved issues contemplated by the prior stipulated judgment commenced in June 2009 before Judge John Somers and continued over several months. Several issues were adjudicated at the trial. The most contentious issue involved a community-asset business called Burwell Concrete, Inc. (BCI). The court was tasked with deciding whether approximately $2.5 million in postseparation income from BCI was community income or Gary's separate income. The trial also dealt with claims of breach of fiduciary duty.

The court eventually issued its ruling on May 16, 2011. First, the court ruled that (1) BCI had been awarded to Gary on August 21, 2008, and (2) postseparation income from BCI prior to August 21, 2008, was community income.

The court then ruled on the breach of fiduciary duty claims as follows: "[T]he court does not find a breach of fiduciary obligation in this case. There is no evidence that petitioner failed to meet her obligations of disclosure, or of good faith and fair dealing, in any way. Respondent's [(i.e., Gary's)] conduct is more problematic. Despite counsel's best efforts, there were often significant delays or problems in the disclosure of relevant financial information. . . . The disclosure issues, while problematic, are not sufficient in the court's view to establish breach of a fiduciary obligation in this case."

The court also ruled that Gary owed Becky (1) $105,195.49 in "back [spousal] support payments and interest"; (2) $125,000 in attorney fees; (3)

$1,524,531 in reimbursements and credits for Becky's portion of community property less $44,283.14 in Gary's reimbursements; and (4) $95,102 in previously ordered equalization payments.

### Gary's Suicide and Becky's Civil and Probate Actions

On April 17, 2010, after trial had commenced, but before the court had issued its aforementioned ruling, Gary committed suicide. Shortly after Gary's death, Becky filed a civil action to prevent the term life policy's proceeds from going to Cynthia. Becky also filed a probate action seeking letters of administration for Gary's estate.

Becky moved to consolidate the civil action with the dissolution proceeding. Cynthia opposed consolidation. In her opposition papers, Cynthia argued that there were "no remaining issues left to be determined in the family law matter." Her opposition papers further stated that she "is not a party to the action nor does she have any real interest in the outcome." The court denied the motion to consolidate, but ordered the civil action stayed.

### Becky's Motion Regarding the Insurance Policy

Concurrent with her motion to consolidate, Becky filed a motion seeking adjudication of the insurance policy as an omitted asset. (See Fam. Code, § 2556.) Becky contended that she was entitled to 100 percent of the proceeds. She acknowledged that she was aware of the policy when it was purchased, but assumed Gary had let it lapse.

Becky argued she was entitled to the proceeds under three legal theories. First, Gary's purported change of beneficiary from Becky to Cynthia was void because it was made in violation of the ATROs. As a result, Becky was still the operative beneficiary under the policy. Second, Gary's failure to disclose the insurance policy in his disclosures violated Family Code section 1101, and therefore the proceeds should be awarded entirely to Becky under subdivision (h) of that section. Third, the court retained jurisdiction over omitted community property assets under the August 2008 stipulated judgment. She argued she was entitled to half the proceeds as her share of the community asset. She also claimed the other half of the proceeds because they exceeded the amount of debt Gary owed her. These included amounts Gary allegedly owed her under the August 2008 stipulated judgment and "anticipated amounts [Gary] will owe [Becky] once Judge Somers makes his ruling [after the trial on reserved issues]." Becky subsequently filed a "Supplemental Memorandum of Points and Authorities" raising a fourth theory of recovery. In that filing, Becky argued that Gary's purported change of beneficiary must be set aside as a fraudulent transfer under section 3439.04 of the Civil Code.

Cynthia filed briefing in opposition to the motion and her counsel appeared at oral argument. She contended that the policy was Gary's separate property. She also argued that to the extent the ATROs apply to separate property, they conflict with Family Code section 2010. Cynthia contended that section 2010 provides that "the court has no jurisdiction over a spouse[']s separate property."

*Court's November 9, 2011, Order*

Judge Susan M. Gill ruled on the motion in an order dated November 9, 2011.[4] It is from this order that both parties appeal.

The court found that Gary failed to disclose the policy and thereby violated his fiduciary duty to Becky. As a result, the policy was deemed an omitted asset and was "neither distributed in the Judgment on Reserved Issues, nor included in Judge Somers' ruling of April 1, 2010." Therefore, the ATROs continued to apply to the asset, and Gary's change of beneficiary to Cynthia "is void."

The court ruled that the policy was a community asset. The ruling contained no analysis of the characterization issue, but did cite to *Estate of Logan* (1987) 191 Cal.App.3d 319, 326 [236 Cal.Rptr. 368] (*Logan*) and *In re Marriage of Gonzalez* (1985) 168 Cal.App.3d 1021, 1024–1026 [214 Cal.Rptr. 634].

The court ordered one-half of the $1 million proceeds distributed to Becky "as her share of this community property asset." The court ordered that the remaining half of the proceeds "shall become part of [Gary's] estate." The order notes that Becky is a creditor of the estate "and the Probate Court must resolve the issue of what priority to give [Becky's] creditor claims against [Gary's] estate."

*Postruling Filings Below*

Cynthia filed a notice of intent to move for a new trial, seeking an order "(1) setting aside the ruling signed on November 7, 2011, that awards one-half of the term life insurance proceeds to Becky . . . and (2) granting [a] new trial." (See fn. 6, *post*.)

Cynthia also filed a notice of appeal from the November 9, 2011, order. Becky filed a notice of cross-appeal from the same order.

---

[4] The minute order cover sheet on the court's letterhead is dated November 9, 2011. The attached ruling was on pleading paper and was dated November 7, 2011.

*Motions Filed on Appeal*

Cynthia filed a motion to augment the appellate record with an October 22, 2009, transcript of testimony from the trial on reserved issues. Becky opposed the motion to augment and requested that we strike certain portions of Cynthia's opening brief referencing the transcript and certain portions of appellant's appendix, volume II. Becky contends these documents pertained to the trial on reserved issues before Judge Somers and were not before Judge Gill when she issued the appealed order. We granted the motion to augment the record, but did not "resolve the transcript's relevance to any issue on appeal or whether the court will consider the reporter's transcript on review." We previously deferred ruling on Becky's motion to strike pending further order of this court. We now deny it.[5] (See *People v. Preslie, supra,* 70 Cal.App.3d at pp. 490–491.)

Becky moved this court to dismiss Cynthia's appeal for lack of standing. We previously deferred ruling on the dismissal motion. For the reasons explained below, we now deny that motion as well.

## DISCUSSION

### I.

### CYNTHIA IS A "PARTY" FOR PURPOSES OF APPELLATE STANDING

■ In California, the right to appeal civil actions is statutory. (*Jordan v. Malone* (1992) 5 Cal.App.4th 18, 21 [6 Cal.Rptr.2d 454].) In order to exercise that statutory right, an appellant must have standing. (*Ibid.*)

Appellate standing is conferred by section 902 of the Code of Civil Procedure. (*Rao v. Campo* (1991) 233 Cal.App.3d 1557 [285 Cal.Rptr. 691]; see Code Civ. Proc., § 902.) That statute provides, in relevant part, that "[a]ny

---

[5] Becky moved to strike portions of Cynthia's opening brief that refer to exhibits Nos. 22, 22a, 23, 24 and 25 of appellant's appendix, and the October 22, 2009, reporter's transcript. She contends the exhibits and transcript are "not properly before" this court because they were not "before" Judge Gill when she issued the appealed order. Rather, they had been lodged earlier in the case during the trial on reserved issues before Judge Somers.

The exhibits are properly before us. We may augment the record to include "[a]ny document filed or lodged *in the case* in superior court . . . ." (Cal. Rules of Court, rule 8.155(a)(1)(A), italics added.) "By the explicit terms of the rule it is not a prerequisite to augmentation that the requested documents be offered or used on the trial or hearing below." (*People v. Preslie* (1977) 70 Cal.App.3d 486, 490 [138 Cal.Rptr. 828].) Becky's motion to strike portions of appellant's appendix and opening brief is denied.

party aggrieved may appeal . . . ." (Code Civ. Proc., § 902.) By its plain language, Code of Civil Procedure section 902 limits appellate standing in two important ways. To have appellate standing, one must (1) be a party and (2) be aggrieved. (*Ibid.*; see *Conservatorship of Gregory D.* (2013) 214 Cal.App.4th 62, 67 [153 Cal.Rptr.3d 657].)

In her motion to dismiss, Becky argues Cynthia was not a "party" to the action below and therefore lacks standing. She does not contend Cynthia was not "aggrieved" by the order from which she ostensibly appeals.

The general rule is that "only a party of record to the proceedings in the trial court may appeal." (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 131, fn. 5 [59 Cal.Rptr.2d 2, 926 P.2d 969].) But a party of record includes " 'one who takes appropriate steps to become a party of record in the proceedings.' " (*In re Silvia R.* (2008) 159 Cal.App.4th 337, 345, fn. 3 [71 Cal.Rptr.3d 496].) For example, a person or entity that moves to vacate a judgment pursuant to Code of Civil Procedure section 663 becomes a "party" for purposes of appellate standing. (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736 [97 Cal.Rptr. 385, 488 P.2d 953] (*Carleson*).)

The California Supreme Court held in *Carleson* that "one who is legally 'aggrieved' by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663." (*Carleson, supra*, 5 Cal.3d at p. 736.) As Becky argues in her motion, "Cynthia did not move to vacate the judgment under Code of Civil Procedure section 663." But Cynthia did file a motion seeking to "set aside" the subject order under Code of Civil Procedure section 657.[6] Thus, if the *Carleson* rule applies to any motion to vacate or set aside an order and is not

---

[6] On its own motion, this court has augmented the record to include Cynthia's notice of intent to move for a new trial. (See Cal. Rules of Court, rules 8.155(a)(1)(A), 8.124(b)(1)(A), 8.122(b)(1)(D).) We notified the parties of our intent to augment the record in this manner and permitted the filing of objections. Becky (through counsel) filed a letter indicating that she did not have an objection to the augmentation, but she advised this court of additional proceedings regarding the motion for new trial. The letter and its attachments indicate that after filing the notice of intent, Cynthia requested an extension of time to "file a Motion for New Trial." The letter and its attachments further indicate that the court denied the request for an order extending time and that "no Motion for New Trial was ever filed." Even if we were to consider this information, it is not relevant for purposes of determining standing.

The notice of intention to move for a new trial is itself the motion for a new trial. (Code Civ. Proc., § 659, subd. (b).) Cynthia very well may have failed to file a memorandum of points and authorities or supporting affidavits or some other documents to support the motion. And, if true, that failure alone could have been grounds for denial. (See Cal. Rules of Court, rule 3.1600(b).) But for purposes of standing, we are concerned with whether Cynthia made the subject motion, not whether it was successful. That is, we are determining whether Cynthia took " 'appropriate steps to become a party of record in the proceedings' " (*In re Silvia R., supra*, 159 Cal.App.4th at p. 345, fn. 3) not whether those efforts were meritorious.

limited to motions brought under Code of Civil Procedure section 663, then Cynthia would be a party of record for purposes of appellate standing. In accordance with the general rule that doubts as to standing are resolved in favor of the right to appeal (*Apple, Inc. v. Franchise Tax Bd.* (2011) 199 Cal.App.4th 1, 13 [132 Cal.Rptr.3d 401]), we hold that the *Carleson* rule does apply here.

For the reasons explained below, we view the Supreme Court's reference to Code of Civil Procedure section 663 in *Carleson* (*Carleson, supra,* 5 Cal.3d 730) as merely identifying one type of motion to vacate that will confer "party" status on the movant for purposes of appellate standing. In this context, we see no relevant distinction between a motion seeking to set aside a decree (Code Civ. Proc., § 663) and a motion seeking to "vacate[]" a "decision" (Code Civ. Proc., § 657). Thus, we believe the most faithful application of *Carleson* would permit an appeal here, where the appellant moved to set aside the judgment in the lower court.

In support of its holding in *Carleson*, the Supreme Court cited to five cases: *Eggert v. Pac. States S. & L. Co.* (1942) 20 Cal.2d 199, 201 [124 P.2d 815] (*Eggert*); *In re Elliott* (1904) 144 Cal. 501 [77 P. 1109] (*Elliott*); *Estate of Partridge* (1968) 261 Cal.App.2d 58 [67 Cal.Rptr. 433]; *Estate of Sloan* (1963) 222 Cal.App.2d 283 [35 Cal.Rptr. 167]; and *Butterfield v. Tietz* (1966) 247 Cal.App.2d 483 [55 Cal.Rptr. 577] (*Butterfield*). (*Carleson, supra,* 5 Cal.3d at pp. 736–737.)

In all of these cases, there was no indication that a person must file a motion seeking to vacate the judgment under a particular statute. To the contrary, in *Estate of Sloan,* the court described *Eggert* and other cases as holding that a party must "move to vacate *or otherwise formally oppose* the judgment appealed from below." (*Estate of Sloan, supra,* 222 Cal.App.2d at p. 292, italics added.) Likewise, the remainder of the cases do not require the motion to vacate be made pursuant to any particular statute.[7]

Thus, we view *Carleson*'s reference to Code of Civil Procedure section 663 as merely identifying the statute under which that case's particular motion was brought. We do not view the statutory citation as limiting the scope of *Carleson*'s holding. (*Carleson, supra,* 5 Cal.3d 730.)

---

[7] See *Eggert, supra,* 20 Cal.2d at page 201 (holding appellants lacked standing, and noting they had ample opportunity "to become parties of record by moving to vacate the orders to which they objected"); *Elliott, supra,* 144 Cal. at page 509 (a person can "make himself a party by moving to set aside such judgment or order"); *Estate of Partridge, supra,* 261 Cal.App.2d at page 60 ("proper procedure" was to "move to set aside *or* vacate such order" (italics added)); *Butterfield, supra,* 247 Cal.App.2d at pages 484–485 ("Ordinarily, if an appellant is not a party of record at the time of judgment or order from which appeal is taken, an appeal is not in order without first filing a motion to vacate the adverse ruling.").

The Fourth Apellate District arrived at a similar conclusion in *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336 [100 Cal.Rptr.2d 446] (*Hughes Aircraft*). The Court of Appeal applied the *Carleson* rule where the appellant had moved for a judgment notwithstanding the verdict and for a new trial. (*Hughes Aircraft, supra*, 83 Cal.App.4th at pp. 1342–1343.) In *Hughes Aircraft*, the appellant's motions challenging the judgment below were brought under Code of Civil Procedure sections 629 and 657, not Code of Civil Procedure section 663. (*Hughes Aircraft, supra*, at pp. 1342–1343.) Nonetheless, the court held that motions for judgment notwithstanding the verdict and a new trial are similar to the Code of Civil Procedure section 663 motion in *Carleson*, in that they "ask the trial judge to vacate a verdict or judgment and enter a new one." (*Hughes Aircraft, supra*, at p. 1343.) We agree with this approach, where reviewing courts determine the applicability of the *Carleson* rule by looking to the nature of the underlying motion, not its statutory basis. (*Carleson, supra*, 5 Cal.3d 730.)

Here, Cynthia's motion sought to "set[] aside the ruling signed November 7, 2011," and was therefore a motion seeking to vacate the order for purposes of the *Carleson* rule. Contrary to Becky's contention in her motion to dismiss, Cynthia is a "party" for purposes of appellate standing. (See *Carleson, supra*, 5 Cal.3d at pp. 736–737.)[8]

Next, we address the characterization of term life insurance proceeds.

## II.

## THE POLICY PROCEEDS CANNOT BE CHARACTERIZED ON THIS FACTUAL RECORD

■ Unless otherwise provided by statute, all property acquired during marriage while domiciled in California is community property. (Fam. Code, § 760.) One category of separate property, the "earnings and accumulations of a spouse . . ." while living separate and apart from the other spouse, [is] the separate property of the spouse." (Fam. Code, § 771, subd. (a).) But "property *attributable* to community earnings must be divided equally when the community is dissolved." (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 847–848 [126 Cal.Rptr. 633, 544 P.2d 561], italics added (*Marriage of Brown*).)

Here, we must apply these principles to term life insurance proceeds.

---

[8] Becky's motion to dismiss the appeal is denied.

"Term life insurance policies typically contain two elements, dollar coverage payable in the event of death and a right to renewal for future terms without proof of current medical eligibility." (*Logan, supra,* 191 Cal.App.3d at p. 324.) "At the expiration of the term of years, the policy expires without retaining cash value." (*Ibid.*)

■ There is a split of authority in California regarding the characterization of term life insurance proceeds as community or separate property. (See *In re Marriage of Spengler* (1992) 5 Cal.App.4th 288, 292–293 [6 Cal.Rptr.2d 764] (*Marriage of Spengler*).) On one side is *Logan, supra,* 191 Cal.App.3d at page 325.

Logan *decision*

In *Logan,* the First Appellate District held that term life insurance policies only remain community property after separation for as long as community funds are used to pay the premium. (*Logan, supra,* 191 Cal.App.3d at p. 325.) Otherwise, if the insured remains insurable, the term policy is not a divisible community asset because "the policy is of no value and the community has fully received what it bargained for." (*Id.* at pp. 325–326.) In dictum, *Logan* indicated that "[i]f the insured becomes uninsurable during the term paid with community funds, then the right to future insurance coverage which cannot otherwise be purchased is a community asset to be divided upon dissolution." (*Id.* at p. 326.) In *Marriage of Spengler, supra,* 5 Cal.App.4th 288, the Third Appellate District agreed with the holding of *Logan* but disagreed with its dictum. (*Marriage of Spengler, supra,* at p. 293.)[9]

Biltoft *and* Woodmen *decisions*

Conversely, in *Biltoft v. Wootten* (1979) 96 Cal.App.3d 58 [157 Cal.Rptr. 581] (*Biltoft*), the Fourth Appellate District held that proceeds from term life insurance "must be apportioned between community and separate property in

---

[9] Two Court of Appeal cases deal with a different issue: the valuation of a term life policy at the time of dissolution while the insured spouse is still alive. (*In re Marriage of Lorenz* (1983) 146 Cal.App.3d 464, 466–468 [194 Cal.Rptr. 237]; *In re Marriage of Gonzalez, supra,* 168 Cal.App.3d at p. 1025.) The Second Appellate District held a term life insurance policy was not divisible community property because it was "worthless" until its benefits were payable. (*In re Marriage of Lorenz, supra,* 146 Cal.App.3d at pp. 466–468.) The Fourth Appellate District held term life insurance policies may have replacement value when the " 'insurability of the insured is lessened because of advancing age or declining health, and the existing policy cannot be cancelled or contains a guaranty of insurability.' " (*In re Marriage of Gonzalez, supra,* 168 Cal.App.3d at p. 1025.) These cases are not directly on point. (See *In re Marriage of Havins* (1996) 43 Cal.App.4th 414, 419, fn. 3 [50 Cal.Rptr.2d 763].) Here, we are dealing with "the division of proceeds of the policy upon death," not the division of the policy while the insured is still alive. (See *ibid.*) This distinction is important, as explained below. (See fn. 12, *post.*)

the same ratio that the amount of premiums paid from community earnings bears to the amount of premiums paid from separate property." (*Id.* at p. 62.) It rejected the notion "that no person has an interest in a term life insurance policy beyond the date the premium is due . . . ." (*Id.* at p. 61.) It disagreed with the argument that "each premium payment is a new contract," citing *Modern Woodmen of America v. Gray* (1931) 113 Cal.App. 729 [299 P. 754] (*Woodmen*). (*Biltoft, supra,* at p. 61.)

■ With a few exceptions, we agree with *Logan.* The coverage and premium provisions of term life insurance policies "provide[] dollar coverage only for the specific term for which the premium was paid." (*Logan, supra,* 191 Cal.App.3d at p. 324.) Therefore, the characterization of the proceeds "will depend on the . . . premium for the final term of the policy." (*Minnesota Mutual Life Ins. Co., supra,* 174 F.3d at p. 983.)[10] When the final premium is paid solely with community property, "the proceeds of the policy are community property." (*Logan, supra,* 191 Cal.App.3d at p. 321.) Conversely, when the separate estate pays for the final premium with no help from the community, the proceeds are a separate asset. (*Id.* at pp. 321, 325.)

We believe *Biltoft* and *Woodmen* err in analyzing the relevant property interests at the wrong level of abstraction. That is, those opinions generally identify the property interest as the entire insurance policy. We believe the proper unit of analysis is the individual contractual rights conferred by the policy. As was said in an analogous context, "[t]he Court of Appeal's . . . analysis rests on the erroneous legal assumption that [the asset] was . . . unitary and indivisible . . . . It is not." (*In re Marriage of Sonne* (2010) 48 Cal.4th 118, 127 [105 Cal.Rptr.3d 414, 225 P.3d 546].)[11] Similarly, a term life insurance policy is not a unitary and indivisible asset giving rise to a unitary and indivisible property interest. Rather, the relevant property interests are the individual enforceable contractual rights derived from the policy. (See Civ. Code, § 953; cf. *Marriage of Brown, supra,* 15 Cal.3d at p. 845 ["a contractual right is . . . a chose in action, a form of property (see Civ. Code, § 953; [citation]) . . ."].)

■ "An insurance policy is a contract between an insurer and an in-sured . . . , the insurer making promises, and the insured paying premiums,

---

[10] In its characterization of the term life proceeds at issue, *Minnesota Mutual Life Ins. Co., supra,* 174 F.3d 977 relied heavily on *Logan.* (*Minnesota Mutual. Life Ins. Co., supra,* 174 F.3d at p. 983.) However, the case distinguishes *Logan*'s medical uninsurability exception. (*Minnesota Mutual Life Ins. Co., supra,* at pp. 983–984.)

[11] In *Marriage of Brown, supra,* 15 Cal.3d 838, our Supreme Court held that the contractual right to receive pension payments was a form of property for dissolution purposes. *Marriage of Brown* held "the employee's right to [pension] benefits is a contractual right, *derived* from the terms of the employment contract. [This] *contractual right* is . . . a form of property (see Civ. Code, § 953; [citation]) . . . ." (*Id.* at p. 845, italics added.)

the one in consideration for the other, against the risk of loss . . . ." (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 45 [65 Cal.Rptr.2d 366, 939 P.2d 766], citations omitted.) One of the insurer's promises in a term life policy is the agreement to pay the policy proceeds if the insured dies between dates X and Y. The payment of the subsequent premium is consideration for another promise from the insurer: to pay the proceeds if the insured dies between dates Y and Z. In other words, the " 'premium is the amount paid for . . . a *certain period* of coverage.' " (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1324 [90 Cal.Rptr.3d 589], italics added.)

Each premium payment gives rise to an enforceable contractual right of coverage for an additional period of time. As premiums are paid over the life of the policy, distinct property interests in coverage for various periods of time arise. Of those distinct property interests, only one is worth anything in hindsight: coverage for the term during which the insured dies.[12] Thus, the relevant inquiry is who obtained the specific contractual right to coverage for the *final* term,[13] and how. (*Minnesota Mutual Life Ins. Co., supra,* 174 F.3d at p. 983 [characterization of proceeds "will depend on the . . . premium for the final term of the policy"].)

As we will explain, *Biltoft*'s and *Woodmen*'s misidentification of the relevant property interests leads to their erroneous characterization of the proceeds and the needless deaths of countless straw men.

*Biltoft* and *Woodmen* first reject the argument that each premium payment does not create a new contract. They are correct to discredit this notion. The relevant "property" is not a unitary and indivisible interest in the entire policy contract, but in the individual enforceable contractual rights derived from it. (See Civ. Code, § 953; cf. *Marriage of Brown, supra,* 15 Cal.3d at p. 845 ["a

---

[12] Prior terms of coverage only lack value in hindsight (i.e., when it is certain the contingency has failed). Prospectively, all coverage terms have at least expected value. (But cf. *In re Marriage of Lorenz, supra,* 146 Cal.App.3d 464.) That is why it is important to maintain a distinction between cases involving the characterization of a term life policy while the insured is still alive (e.g., *In re Marriage of Lorenz, supra,* 146 Cal.App.3d 464; *In re Marriage of Gonzalez, supra,* 168 Cal.App.3d 1021), and cases involving the characterization of term life policy *proceeds* after the insured has died (e.g., *Logan, supra,* 191 Cal.App.3d 319; *Biltoft, supra,* 96 Cal.App.3d 58). (See *In re Marriage of Havins, supra,* 43 Cal.App.4th at p. 419, fn. 3.)

[13] Our use of the phrase "final term" or "final coverage term" refers to- the term during which the insured dies. We refer to the corresponding premium as the "final premium payment" or "final premium." We recognize that when the insured does not die during the entire term of the overall policy, then even the final term has no substantive value. But that is not the situation here, so our use of these phrases presumes that the insured has died during a term of the policy.

contractual right is . . . a chose in action, a form of property (see Civ. Code, § 953; [citation]) . . ."].) While each premium payment does not create a new contract, it does give rise to a new enforceable contractual right and thus a distinct property interest. By way of analogy, consider a one-year apartment lease. Each rent payment does not create a new lease, but paying January's rent does not entitle a tenant to live there in October.[14]

*Biltoft* and *Woodmen* next assert "it would be unreasonable to hold that the payment of the premiums . . . would convert the entire proceeds . . . ." (*Biltoft, supra*, 96 Cal.App.3d at p. 61; *Woodmen, supra*, 113 Cal.App. at p. 732.) This is true, as far as it goes. The separate estate's subsequent payment of the premium does not "convert" the community's "proceeds." But the point is they were never the community's proceeds to begin with. The proceeds belong to whomever the insurance company is contractually obligated to pay. In other words, the valuable property interest is the enforceable contractual right to compel payment of the proceeds. (See Civ. Code, § 953; cf. *Marriage of Brown, supra*, 15 Cal.3d at p. 845 ["a contractual right is . . . a chose in action, a form of property (see Civ. Code, § 953; [citation]) . . ."].) In this context, that contractual right is the coverage during which the insured dies. The community did not acquire this contractual right. Instead, the community paid for, and received in full, a different contractual right: the right to be paid upon a contingency that ultimately failed. The important aspect of this contractual right is not that it has been converted or appropriated by the separate estate (it has not). The pivotal attribute of the community's interest is its complete lack of value. It does not entitle its holder to the policy proceeds and never will. The right to be paid if the insured dies between January 1 and January 31 becomes forever worthless on February 1 if the insured is alive. That is how term insurance works.

Even *Logan* briefly falls prey to this erroneous "conversion theory." *Logan* states: "If, as is usually the case, the insured is insurable at the end of the term purchased with community funds, the renewed policy, that is, the term policy purchased by the payment of the premium with postseparation earnings which are separate property . . . *changes character from community to separate property.*" (*Logan, supra*, 191 Cal.App.3d at pp. 324–325, italics added.) We disagree. The reason the community is not entitled to the

---

[14] The rationale of *Biltoft* and *Woodmen* does lend itself well to other contexts where the community pays into an asset that retains cash value. For example, whole life insurance policies "provide both insurance *and cash value accumulation.*" (*Chabner v. United of Omaha Life Ins. Co.* (9th Cir. 2000) 225 F.3d 1042, 1045, fn. 1, italics added.) In that situation, the community is paying for dollar protection against a contingency *and the right to a portion of the policy's cash value accumulation.* In that way, a whole life policy is more akin to a home mortgage than an apartment lease.

proceeds is not because contractual rights have changed in character. It is because the separate and community estates have different contractual rights; one valuable and the other not. The community has the worthless right to payment upon a contingency that has failed. The separate estate has the valuable right to payment upon a contingency that has occurred. The point is "the community has fully received everything it bargained for . . ." (*id.* at p. 325), not that the community's rights have become separate property.

■ These principles only bring us so far. It is clear that characterization of the proceeds as separate or community "will depend on the . . . premium for the final term of the policy." (*Minnesota Mutual Life Ins. Co., supra,* 174 F.3d at p. 983.) Complications arise when the separate estate uses a community asset to acquire the final term of coverage.

"[I]t is . . . well established that, upon separation of the parties or dissolution of marriage, one spouse is not entitled to appropriate a community asset for his or her own use without reimbursing the community for the value of the appropriated asset." (*In re Marriage of Elfmont* (1995) 9 Cal.4th 1026, 1039 [39 Cal.Rptr.2d 590, 891 P.2d 136] (conc. & dis. opn. of George, J.) (*Marriage of Elfmont*).) The community must be reimbursed to the extent it owns or has an interest in the contractual rights used by the separate estate to obtain the final coverage term. As explained, *post,* this concept is relevant where the insured spouse becomes medically uninsurable during a term paid for by the community.

### Medical Uninsurability and the Right of Renewal

A person is medically uninsurable if they are "unable to obtain individual life insurance." (*Spengler, supra,* 5 Cal.App.4th at p. 291.) A person may become uninsurable because of the condition of his or her health. (Cf. *United States v. Ryerson* (1941) 312 U.S. 260, 262 [85 L.Ed. 819, 61 S.Ct. 479].) Sometimes, a person who becomes medically uninsurable may nonetheless continue existing coverage by virtue of a contractual right to renew his or her policy. (*Marriage of Elfmont, supra,* 9 Cal.4th at p. 1034.) This is referred to as the "right of renewal." (*Ibid.*)

The right of renewal is an enforceable contractual right and a property interest. (See Civ. Code, § 953; see also *Marriage of Brown, supra,* 15 Cal.3d at p. 845 ["a contractual right is . . . a chose in action, a form of property (see Civ. Code, § 953; [citation]) . . ."].) The community initially purchased this

right of renewal, and maintained it for a period of time through subsequent premiums. The right of renewal is therefore, at least in part, community property. (Fam. Code, § 760.)

▉ When the insured spouse becomes medically uninsurable during the community's terms of coverage, his or her separate estate can only acquire subsequent terms of coverage by appropriating the community's contractual right to renew. By definition, the uninsurable spouse would be unable to continue coverage without it. Thus, the acquisition of the final coverage term is dependent on both the separate estate's payment of premiums *and the community's renewal right*. Both the separate and community estates are contributing towards the purchase of subsequent coverage terms (including the all-important final coverage term). The community's contribution is represented by the premiums it has paid over the life of the policy, which are the funds expended to acquire and retain the renewal right. Once the premiums are paid solely by separate funds, it is the separate estate that is maintaining the renewal right. Given the joint effort of community and separate assets in acquiring the relevant asset (i.e., the final coverage term), the proceeds obtained therewith must be apportioned. "[I]t is . . . well established that, upon separation of the parties or dissolution of a marriage, one spouse is not entitled to appropriate a community asset for his or her own use without reimbursing the community for the value of the appropriated asset." (*Marriage of Elfmont, supra,* 9 Cal.4th at p. 1039 (conc. & dis. opn. of George, J.).)[15]

▉ This view is consistent with dicta from the Supreme Court's decision in *Marriage of Elfmont.* In discussing term life insurance, the Supreme Court stated: "To provide for a former spouse's participation in [the] proceeds, when premium payments from community funds have purchased policy renewal rights necessary to keep the insurance in force, may well be appropriate." (*Marriage of Elfmont, supra,* 9 Cal.4th at p. 1034.)

---

[15] *Marriage of Spengler* is distinguishable on this point. *Marriage of Spengler* dealt with an "employment-related group term life insurance policy." (*Marriage of Spengler, supra,* 5 Cal.App.4th at p. 290.) In *Marriage of Spengler,* the court held that the renewal right "was a mere expectancy rather than a contingent property interest" because the right "depended not only on continued employment by husband but also on continued offering of the plan by the employer." (*Id.* at p. 298.) An expert had testified that "any group term life insurance policy can be terminated by the employer at any time, with 30 days' notice." (*Ibid.*) Thus, "the prospect of renewal of the policy by the employer was a beneficence to which husband had no enforceable right." (*Id.* at p. 299.)

Here, there is no provision for unilateral termination of the policy by the insurer. Nor do we find any analogous provision that would render the contractual right a mere expectancy.

In this situation, where the insured spouse becomes uninsurable during a term paid for by the community, the proper apportionment of the proceeds is "between community and separate property in the same ratio that the amount of premiums paid from community earnings bears to the amount of premiums paid from separate property." (*Biltoft, supra,* 96 Cal.App.3d at p. 62.)[16]

### Premium Caps

 There is another scenario wherein the separate estate could appropriate the community's contractual rights. Over time, a spouse may remain insurable but become more expensive to insure "because of advancing age or declining health." (*In re Marriage of Gonzalez, supra,* 168 Cal.App.3d at p. 1025.)[17] That is why some term insurance policies, like the policy at issue here, provide for a cap on premiums during a particular period of time. With a cap provision, the premium for a particular term may not solely reflect actuarial considerations relative to the insured's likelihood of dying during that term. The price may be "artificially" low in accordance with the premium cap. The cap has value when the premiums would otherwise exceed the maximum it allows.

The cap itself is a contractual right to be charged premiums at or below a maximum amount. Both the separate *and community* estates have paid premiums to maintain this contractual right. Thus, if the insured spouse renews the policy postseparation, and the premiums would have been higher without the premium cap, the insured spouse has necessarily appropriated property which the community acquired and helped maintain.[18]

 As noted *ante,* the characterization of the proceeds as separate or community "will depend on the . . . premium for the final term of the policy." (*Minnesota Mutual Life Ins. Co., supra,* 174 F.3d at p. 983.) In the case of lessened insurability, the final premium obligation is met by the joint effect of (1) the funds expended by the separate estate to pay the premium and (2) the "discount" embodied in the premium cap which is a partial community asset. Thus the community should receive a fraction of the proceeds based on two factors: (1) the community's role in maintaining the contractual right to a

---

[16] To this we would add that the premium-paying spouse should be credited with half of the final premium payment. While the *Biltoft* method addresses the separate and community estates' relative contributions towards the renewal right, there is no recognition of the separate estate's unique contribution to the final coverage term by paying the final premium.

[17] Sometimes, this is referred to as "lessened" insurability. (*In re Marriage of Gonzalez, supra,* 168 Cal.App.3d at p. 1025.) While this diction conflicts with the arguably binary nature of insurability, it is a convenient term and we employ it here.

[18] In this situation, the insured spouse is not wholly dependent on the community's contractual rights as in the case of complete uninsurability. Rather, the insured spouse is appropriating the community's property and thereby receiving what is effectively a discount on premiums.

premium cap and (2) the premium cap's role in the separate estate's acquisition of the final term of coverage. That fraction would be calculated as follows:[19]

$$\frac{\text{(percentage of total premiums paid by community)}}{\text{(actual premium paid for the final term of coverage)}} \times \text{(effective premium discount for final term of coverage)}$$
$$+ \text{(effective premium discount for final term of coverage)}$$

For example, consider the following hypothetical. The community pays 50 percent of the premiums over the life of a policy. Without the premium cap, the insured spouse would have had to pay $1,000 for the premium for the final coverage term. However, because of the premium cap, the insured spouse only had to pay a $400 premium for the final coverage term.

$$\frac{50\% \times \$600}{\$600 + \$400} \longrightarrow \frac{\$300}{\$1,000} \longrightarrow \frac{3}{10}$$

In this scenario, the community would be entitled to three-tenths, or 30 percent, of the proceeds.

The term life insurance policy at issue here also had a suicide clause whereby the insurer was not obligated to pay the proceeds if the insured committed suicide within two years of the policy date. In a petition for rehearing, Becky contends the reasoning we apply above with respect to premium caps and renewal rights should also apply to the suicide clause. We disagree.

In our discussion of premium caps and renewal rights above, we acknowledge situations where the separate estate may appropriate the community's contractual rights to obtain the policy proceeds. And, when one spouse appropriates a community asset for separate use, he or she must reimburse the community. (*Marriage of Elfmont, supra*, 9 Cal.4th at p. 1039 (conc. & dis. opn. of George, J.).) Thus, it is the separate estate's appropriation of a community asset (e.g., the renewal right, premium cap) that triggers the duty to reimburse. In contrast to the renewal right, the right to avoid payment of the proceeds in the event of suicide belongs to the insurer, not the community estate. (See Civ. Code, § 1458 ["A right arising out of an obligation is the property of the person to whom it is due . . . ."].) Thus, in the context of suicide clauses, the separate estate has not appropriated contractual rights belonging to the community.

---

[19] The numerator is the percentage of premiums paid by the community throughout the life of the policy multiplied by the premium discount the separate estate received by virtue of the premium cap when it purchased the final term of coverage. The denominator is the entire premium discount received by the separate estate by virtue of the premium cap when it purchased the final term of coverage plus the actual amount paid for the final premium. The premium discount would likely need to be established by expert testimony.

*Summary*

 In sum, the proper characterization of term life insurance proceeds depends on a number of factors. The proceeds are entirely community when the final premium is paid solely with community property. (*Logan, supra*, 191 Cal.App.3d at p. 321.) The proceeds are entirely separate property when (1) a separate estate has paid the final premium with separate funds; (2) the insured spouse was insurable at the end of the last term paid for by community funds; and (3) either (a) the insured spouse's health was such that he or she could have purchased a comparable policy at a comparable price when the separate estate began paying the premiums, or (b) the policy did not contain a premium cap when the separate estate began paying the premiums. The proceeds are part community and part separate where (1) the separate estate has paid the final premium with funds that are part community and part separate; or (2) the insured spouse has become medically uninsurable before he or she began paying the premiums with separate property; or (3) the insured spouse could not have purchased a comparable policy at a comparable price when he or she began paying the premiums with separate property.[20] (See appen. A, *post.*)

We cannot apply these principles to the proceeds at issue here because there is an insufficient factual record.[21] To determine which characterization and/or apportionment method applies, there must be findings of fact on (1)

---

[20] We understand this holding is burdensome. But "the claim of . . . administrative burden surely cannot serve as support for an inequitable substantive rule . . . ." (*Marriage of Brown, supra*, 15 Cal.3d at p. 849.) While we wish a simpler holding were possible, we believe it is compelled by the application of community property principles to the various iterations of term life policies. Presumably, the Legislature is free to eschew these tenets and provide for a simpler methodology for allocating term life insurance proceeds. Until such a time, existing community property principles must govern.

[21] In her petition for rehearing, Becky argues that even under the test we announce in this opinion, there was substantial evidence the proceeds were entirely community property. Specifically, she contends there was substantial evidence Gary paid the final premium payment with community funds. We disagree.

" 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] 'Substantial evidence . . . is not synonymous with "any" evidence.' . . . Speculation or conjecture alone is not substantial evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) Becky points to her declaration as substantial evidence that Gary paid the final premium payment on the policy with community funds, including the following quotation: "All premiums paid on the Reassure America Policy came either from the community property earnings of BCI or from the $2,800,000 of community property funds Mr. Burwell removed from BCI without my knowledge or consent." The disjunctive wording of this statement implies what the very next sentence confirms: Becky did not know whether the funds Gary used to pay the premiums were community property. The next sentence of the declaration reads: "*If* Mr. Burwell commingled the $2,800,000 he misappropriated with his other earnings, the *presumption* is and must be that the community property in his possession was used to pay the community property premiums." (Italics added.) Becky's speculation that Gary might have commingled funds and her presumption he used those commingled funds to pay the premiums is not

whether Gary paid the postseparation premiums with (a) separate funds, (b) funds attributable to his community estate with Becky, or (c) funds attributable to his community estate with Cynthia (or some combination); (2) if Gary paid the premiums with separate funds, whether he was medically insurable when he began doing so; and, if so, (3) whether Gary could have purchased a comparable policy at a comparable price when he began paying premiums with separate funds (and if not, how much more expensive would the premiums have been without the premium cap).

We therefore vacate the order adjudicating the policy proceeds. We remand for the trial court to make these factual findings, and to apply the law as expressed in this opinion to the facts so found.

None of the parties' remaining contentions alter this disposition, as we will now explain in the unpublished portion of the opinion.

## III.–IX.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court's order that the "term life insurance policy was a community asset of the parties" is vacated. The matter is remanded for further evidentiary proceedings to determine the proper characterization and distribution of the term life insurance policy proceeds in accordance with this opinion.

Franson, J., and Peña, J., concurred.

A petition for a rehearing was denied November 21, 2013, and the opinion was modified to read as printed above. The petition of appellant Becky J. Burwell for review by the Supreme Court denied was January 29, 2014, S215160.

---

substantial evidence. On remand, Becky is free to produce any reasonable, credible, solid evidence that Gary paid the premiums with community property. She has not yet done so.

*See footnote, *ante*, page 1.